**FILED**

MAR 13 2013

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA



POSTED ON WEBSITE

NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | | |
|---|---|---|
| In re | ) | Case No. 11-10932-B-7 |
| Balour Singh, | ) | |
|     Debtor. | ) | |
| | ) | |
| First National Bank of Omaha, | ) | Adv. No. 11-01136 |
|     Plaintiff, | ) | |
|     v. | ) | |
| Balour Singh, | ) | |
|     Defendant. | ) | |

**MEMORANDUM DECISION REGARDING
NONDISCHARGEABILITY OF CREDIT CARD DEBT**

Dennis Winters, Esq., appeared on behalf of the plaintiff, First National Bank of Omaha.

Frank P. Samples, Esq., appeared on behalf of the defendant, Balour Singh.[1]

    The plaintiff in this adversary proceeding, First National Bank of Omaha (the "Bank"), seeks a determination that a debt owed by the debtor-defendant Balour Singh (the "Debtor") is nondischargeable under 11 U.S.C.

---

[1]The defendant Balour Singh did not attend the trial.

§ 523(a)(2)(A).[2]  Specifically, the Bank challenges six transactions made by the Debtor, either by use of a credit card or convenience check, which it contends were made with fraudulent intent.  For the reasons set forth below, the Bank has not established the elements of actual fraud as to these six transactions.  Accordingly, judgment will be entered for the Debtor; the debt at issue will be discharged.

This memorandum decision contains the court's findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7052.  The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, 11 U.S.C. § 523, and General Order Nos. 182 and 330 of the U.S. District Court for the Eastern District of California.  This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(I).

**BACKGROUND AND FINDINGS OF FACT.**

**Overview.**  The Debtor filed a voluntary petition under chapter 7 on January 27, 2011.  On Schedule F, he listed 23 separate unsecured debts, which totaled $186,520.68.  Most of these debts appear to be related to credit cards. The debt at issue in this proceeding arises from an unpaid credit card balance owed to the Bank in the amount of $16,058.43.  Specifically, it appears that the Debtor charged six transactions to his credit card account—four balance transfers (the "Balance Transfers"), a single purchase of goods or services (the "Purchase Transaction"), and a single cash advance (the "Cash Advance") between May and August 2010.  Based on the Debtor's financial condition at the time, the Bank contends that the Debtor made these charges to his account with fraudulent

---

[2] Unless otherwise indicated, all chapter, section, and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037, as enacted and promulgated *after* October 17, 2005, the effective date of the Bankruptcy Abuse Prevention & Consumer Protection Act of 2005 (BAPCPA), Pub. L. No. 109-8, 119 Stat. 23 (enacted Apr. 20, 2005).

1    intent, knowing that he could never pay off the debt and planning instead to

2    discharge his debts in this chapter 7 case.

3        **Background of the Debtor.**  Based on the schedules and other

4    documents filed in this bankruptcy case, it appears that the Debtor is married

5    with four dependent children and was unemployed at the commencement of the

6    bankruptcy case. According to Schedule I, the Debtor had no personal income at

7    the time. The household's current monthly income consisted solely of his

8    spouse's wages in the amount of $1,246.18 with monthly expenses reported on

9    Schedule J in the amount of $2,816.32. The Debtor's household had a *negative*

10   monthly net income of $1,570.14. The schedules do not disclose any outside

11   source of monetary support.

12       As late as two years prior to the bankruptcy, the Debtor's financial

13   situation seemed to have been relatively stable. In 2009, the Debtor and his

14   spouse reported a combined income of $38,998 from a number of sources. First,

15   he and his spouse reported $15,027 and $1,626, respectively, in annual wages.

16   The Debtor also reported $22,344 in "business" income from the operation of an

17   ice cream truck.[3] In 2010, his financial situation worsened. The Debtor reported

18   a reduced income of $21,117 on his joint tax return, derived solely from his

19   spouse's wages.[4] It is unclear what happened to the ice cream truck, but no

20   business income was reported for 2010.[5]

21   ――――――――――――――

22       [3] On his 2009 joint tax return, the Debtor reported $47,178 in gross receipts.
     After deducting for $15,741 for costs of goods sold and $11,093 for business expenses,
23   the net profit was $22,344. According to this tax return, it appears that the Debtor never
     paid himself wages or a salary, so his only income from running the business was
24   $22,344.

25       [4] In his Statement of Financial Affairs, the Debtor provides that his spouse's
     wages were $14,954 while his wages were zero. No other sources of income were
26   disclosed for 2010. It is unclear where the remaining $6,613 in income originated from.

27       [5] The ice cream truck business may have experienced a net loss in 2010, but it is
     also possible that the Debtor shut down the business at some point in 2009. On his
28   2010 tax return, the Debtor claimed a Making Work Pay tax credit. In order to obtain

3

**The Credit Card and Convenience Checks.**  The Debtor's relationship
with the Bank began in November 2006, when the Bank issued a credit card to
the Debtor with a credit limit of $5,500 (the "Credit Card Account" or
"Account").  In an effort to attract the Debtor's business, the Bank regularly
mailed to the Debtor sets of unsolicited "convenience checks," which encouraged
the Debtor to, *inter alia*, transfer the unpaid credit card balances from other credit
card issuers to his Credit Card Account, make large purchases, or obtain cash
advances.  Any transactions made with these checks were entitled to a
promotional, low interest rate effective for an entire year.  The cover letters
accompanying the convenience checks contained the following solicitation:

> Great news!  Every one of these checks comes with a low rate that's
> good until the close of your billing cycle ending in [the month one
> year from now].  They're valid immediately and are as simple to use
> as a personal check.  The only difference is that they're linked to
> your [Credit Card Account].
>
> **Use your checks today!**
>
> You can write these checks in any amount up to the credit limit we
> make available for balance transfers:
>
> • **Transfer high-interest credit card balances**
> • **Cover unexpected expenses**
> • **Make a big purchase**
> • **Get extra cash**
>
> A 3%  transaction fee ($10 minimum) will apply to each balance
> transfer (a FINANCE CHARGE), regardless of how you choose to
> respond to this offer.  There is no grace period for these
> transactions.
>
> **Your rate is good until [the month one year from now].**
>
> There's no better time to use your checks.  To receive this Special
> Offer Rate, the transaction must post to the Special Offers Balance
> Category of your Account on or before [the expiration date stated

---

this credit, he indicated that he did not have a net loss from a business on the applicable
tax form.

4

1    on the check][6] (the "Deadline").  To keep this rate for new
2    transactions through the Deadline, you must stay within your credit
     limit, make payments to us when due, and not make payments to
3    use that are dishonored for any reason.

4        On the reverse side of the cover letters, the Bank included a section

5    entitled "Additional Important Information," which explained certain exceptions

6    and conditions applicable to the convenience checks.  The Bank essentially

7    reserved an absolute right to pay all, some, or none of the amount requested

8    through a convenience check, regardless of whether the Debtor's transaction

9    exceeded the credit limit or not:

10        • These transactions are subject to our approval based upon your
           account status, available credit, credit history, and other facts.
11
          • We are not liable if we do not authorize a requested transaction or
12           do not pay one of these checks.  We reserve the right to approve
             transactions in the order we select and to limit the amount of the
13           transactions we approve and of the checks we pay (this amount
             may be less than your total credit limit).  If you request a
14           transaction amount that we do not approve, we may process a
             partial transfer for less than you requested or we may decline the
15           entire request.

16       **Initial Credit Card Activity.**  The first transaction on the Credit Card

17   Account, in November 2006, was a $4,400 balance transfer from another credit

18   card issuer.  While the normal interest rate on the Credit Card Account was

19   9.99%, the Debtor took advantage of the low, promotional interest rate of 1.99%

20   by using a convenience check.  The next month, he used another convenience

21   check in an amount of $1,010 to transfer a balance from a different credit card

22   issuer.  By then, the outstanding balance on the Credit Card Account was

23   $5,348.73.

24       From there, each month the Debtor consistently made the monthly

25   payments due on the Credit Card Account, with each payment amount being

26

27       [6] The deadline to use a convenience check appeared to be within two months of
     receiving the check, meaning that a credit card holder had to use the check rather
28   immediately.

slightly above the required minimum.[7]  In January 2009, the Debtor made a $3,216 payment which dropped the outstanding balance below zero.  Throughout this entire period, November 2006 to January 2009, the Debtor made no other charges to the Credit Card Account.  In response, the Bank spontaneously increased his credit limit to $10,000.

Shortly thereafter, the Debtor started to use his credit card again, albeit sparingly.  In March and April 2009, he used it eight times for small purchases.  He made a $25 purchase in October of 2009.  During this time, the Debtor was never in default and paid his balance in full each following month.  No additional charges were made to the Credit Card Account until February 2010, when the Debtor made an $1,890 charge, apparently for the premium on an insurance policy.  However, he made an $1,890 payment in April to bring his Credit Card Account balance back down again to zero.

**Disputed Credit Card Activity.**  The transactions subject to this litigation began in the following month, May 2010, when the Debtor once again started to use the convenience checks provided by the Bank.  On May 19, 2010, the Debtor used the first of five convenience checks to transfer the balance from an account with Wells Fargo Card Services in the amount of $5,100.  A second check was posted to the Credit Card Account six days later on May 25, representing a $1,500 balance transfer from U.S. Bank.  These two convenience checks were given to the Debtor in an April 2010 solicitation, which offered a 3.99% promotional interest rate.

On June 15, the Debtor made his third balance transfer, again writing a convenience check to Wells Fargo Card Services in the amount of $3,000.  For this balance transfer, the Debtor used a convenience check that came in May

---

[7] The minimum monthly payment amount began at $124 in December 2006 and slowly dropped each month until it became $61 in January 2009.

2010 with an even lower promotional interest rate of 1.99%. With accrued interest and finance charges, the outstanding balance on the Credit Card Account had, by now, almost reached the $10,000 credit limit.

On June 25, 2010, ten days after the third balance transfer was posted, the Bank made some unsolicited changes to the Debtor's Credit Card Account. It again raised the credit limit, this time from $10,000 to $15,000. It also raised the cash limit from $2,000 to $3,000. According to the Bank's internal recordkeeping system, there is an entry—entered immediately prior to the entry authorizing the increases—showing that the Bank received "updated income information" from the Debtor, which may have prompted the increase in the limits. However, there is no evidence to suggest that the Debtor actually submitted any information to the Bank or requested the increased limits. At that time, the Debtor was unemployed and did not have any income. Based on the lack of contrary evidence, the court infers that the Bank unilaterally raised the credit and cash limits without actually ascertaining the Debtor's current financial situation. The Debtor was given notice of the increased limits in July 2010 when he received that month's credit card statement, which clearly listed the new $15,000 credit limit and $3,000 cash limit under the "account summary" section.

In an effort to keep his Account current, the Debtor made two timely monthly payments. On July 1, he paid $275 to the Bank (a $275 minimum was due by July 3), and on July 24, he paid $215 to the Bank (a $212 minimum was due by August 3). Shortly thereafter, the Debtor used another convenience check for his fourth and final balance transfer. This time, he transferred an $800 balance from American Express using a June 2010 convenience check that also offered a 1.99% promotional interest rate. This transaction, which was posted on July 26, 2010, brought his outstanding balance to $10,287.56, an amount still well below the new credit limit of $15,000.

7

After the four Balance Transfers, there was no activity on the account until August 21 when the Debtor used his fifth convenience check to finance a $2,000 transaction at "Gillson Jewelers and Fabr" in Bakersfield, California.[8] Based on the name of the merchant, it appears that the Debtor may have purchased, or made a payment on an account for, either luxury goods or services. However, that fact was never established at trial, and it remains unknown what the Purchase Transaction represents.

Later the same day,[9] the Debtor obtained a $3,000 cash advance, the maximum amount allowed under the Credit Card Account. Unlike the other transactions at issue, which were made with convenience checks, this one appears to be the only transaction actually made with the Debtor's credit card.[10] The August 2010 credit card statement reveals that the Debtor obtained the cash advance at a local branch of Wells Fargo Bank. It is unknown what the Debtor used this cash advance for.

With these final transactions, the Debtor exceeded the recently increased $15,000 credit limit on his Credit Card Account, but the Bank approved and posted them to the Debtor's Credit Card Account anyway. A minimum payment of $205 became due with the September 2010 statement, but the Debtor never

---

[8] The Bank entered into evidence four canceled checks to show that the four Balance Transfers were made using convenience checks, but no evidence was introduced to show that the Debtor used a convenience check to make the Purchase Transaction. However, the September 2010 credit card statement shows that the $2,000 transaction was entitled to the July 2010 promotional 1.99% interest rate for purchases. That interest rate was only available to the Debtor if he used a convenience check.

[9] It is unknown whether the Purchase Transaction or the Cash Advance occurred first since the credit card statement only shows that the transaction date for both was August 21, 2010. Nevertheless, the court assumes that the Cash Advance occurred second because the Bank statement listed the Cash Advance after the Purchase Transaction and no evidence was presented to show otherwise.

[10] Unlike the Purchase Transaction, the Cash Advance transaction was not entitled to a special, low interest rate according to the September 2010 statement. Instead, the Cash Advance was charged 20.24% interest and then 25.24% that month.

8

made this payment, or any other payments to the Bank. In response, the Bank "suspended" the Credit Card Account with the following notice in the next monthly statement:

> Your account is past due. If your account is not already closed, your ability to use this account has been suspended. Please submit a payment by return mail.

This bankruptcy was filed on January 27, 2011, more than five months after the Debtor last used the Credit Card Account. By then, the outstanding balance on the Credit Card Account had risen to $16,058.43, which included the above six transactions, finance charges, late fees, and interest.

**DISCUSSION AND CONCLUSIONS OF LAW.**

**The "Fraud" Exception to Discharge Under § 523(a)(2)(A).** To balance the fresh start afforded to "honest but unfortunate" debtors through a discharge of debts, the Bankruptcy Code excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or *actual fraud.*" § 523(a)(2)(A) (emphasis added). To prove actual fraud, a creditor must establish each of the following five elements: (1) that the debtor made false representations; (2) that at the time he knew they were false; (3) that he made them with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained the alleged loss and damage as the proximate result of the representations having been made. *Citibank (S.D.), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1086 (9th Cir. 1996). These five elements mirror those of common law fraud. *See Field v Mans*, 516 U.S. 59, 69 (1995). In the nondischargeability action, the creditor must prove these elements by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 286 (1991).

9

1    For some consumer debts, the nondischargeabililty question is settled by a

2  statutory, but rebuttable, presumption.  "[C]onsumer debts owed to a single

3  creditor and aggregating more than $600 for luxury goods or services incurred by

4  an individual debtor on or within 90 days before [the commencement of the

5  bankruptcy] are presumed to be nondischargeable." § 523(a)(2)(C)(i)(I).  Some

6  cash advances from a credit card may also be declared nondischargeable by a

7  rebuttable presumption.  Specifically, "cash advances aggregating more than

8  $875 that are extensions of consumer credit under an open end credit plan

9  obtained by an individual debtor on or within 70 days before [the commencement

10  of the bankruptcy] are presumed to be nondischargeable." § 523(a)(2)(C)(i)(II).

11    Here, the Bank seeks a determination that the Debtor's use of the credit

12  card and convenience checks, as summarized above, in the months leading up to

13  the bankruptcy, was done with actual fraud.  However, none of the transactions at

14  issue here fall within the presumption periods prescribed in § 523(a)(2)(C).  The

15  court must therefore determine whether fraud has been established through the

16  common-law elements.

17    **Dischargeability of a Credit Card Debt.**  When the debt at issue arises

18  from the use of a credit card, the first, fourth, and fifth elements of the fraud

19  claim under § 523(a)(2)(A) are generally straightforward.  As to the first element,

20  courts accept the premise that the debtor's use of a credit card constitutes a

21  representation to the creditor of the debtor's intent to repay the debt.  *Anastas v.*

22  *Am. Sav. Bank (In re Anastas)*, 94 F.3d 1280, 1285 (9th Cir. 1996).  For the

23  fourth element, a creditor's reliance on the debtor's representation need only be

24  justifiable, not reasonable, to except a debt from discharge under § 523(a)(2)(A)

25  of the Bankruptcy Code.  *See Field*, 516 U.S. at 74–75.  In the credit card

26  context, unless the debtor's credit card history is marked by "red flags," the

27  creditor can establish reliance on the debtor's promise to pay the debt by simply

28  showing that the debtor paid his or her credit card debts in the past.  *See In re*

*Eashai*, 87 F.3d at 1091.  As to the fifth element, the finding of damages is supported by the fact that the debt was not repaid and is subject to potential discharge in the bankruptcy proceeding.

In a credit card dischargeability case, the issues shift away from the actual representation and focus more on the debtor's state of mind: Knowledge that the representation was false and the intent to defraud.  With respect to credit card debt, the Ninth Circuit Bankruptcy Appellate Panel has noted,

> Where purchases are made through the use of a credit card with no intention at that time to repay the debt, that debt must be held to be nondischargeable pursuant to section 523(a)(2)(A).  To hold otherwise would be to ignore the plain language of the statute and to reward dishonest debtors.

*Citibank S.D., N.A. v. Dougherty (In re Dougherty)*, 84 B.R. 653, 657 (9th Cir. BAP 1988) (quoting *Sears Roebuck & Co. v. Faulk (In re Faulk)*, 69 B.R. 743, 753–54 (Bankr. N.D. Ind. 1986)) (internal quotation marks omitted), *abrogated on other grounds by Grogan*, 498 U.S. 279.

In *In re Dougherty*, the court adopted a nonexclusive list of twelve objective factors that "trial courts should consider" to determine the debtor's intent.[11]  *Id.*  However, "[t]hese factors are nonexclusive; none is dispositive, nor must a debtor's conduct satisfy a minimum number in order to prove fraudulent intent."  *Am. Express Travel Related Servs. Co. v. Hashemi (In re Hashemi)*, 104 F.3d 1122, 1125 (9th Cir. 1997); *see also Household Credit Servs., Inc. v. Ettell (In re Ettell)*, 188 F.3d 1141, 1145 (9th Cir. 1999) ("*Dougherty* does not

---

[11]The twelve *Dougherty* factors are: (1) The length of time between the charges made and the filing of bankruptcy; (2) whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made; (3) the number of charges made; (4) the amount of the charges; (5) the financial condition of the debtor at the time the charges are made; (6) whether the charges were above the credit limit of the account; (7) whether the debtor made multiple charges on the same day; (8) whether or not the debtor was employed; (9) the debtor's prospects for employment; (10) financial sophistication of the debtor;(11) whether there was a sudden change in the debtor's buying habits; and (12) whether the purchases were made for luxuries or necessities.  84 B.R. at 657 (citation omitted).

handcuff the trier of fact, who is in the best position to balance the objective evidence against the witness's testimony and credibility. Totality of the circumstances means totality of the circumstances.").

Rather, "[s]o long as, on balance, the evidence supports a finding of fraudulent intent, the creditor has satisfied this element." *In re Hashemi*, 104 F.3d at 1125 (citing *Grogan*, 498 U.S. at 291). Nevertheless, "the express focus must be solely on whether the debtor maliciously and in bad faith incurred credit card debt with the intention of petitioning for bankruptcy and avoiding the debt." *In re Anastas*, 94 F.3d at 1286.

The Ninth Circuit has since adopted the *Dougherty* approach for determining if the debtor used his or her credit card with a subjective intent to deceive. "Since a debtor will rarely admit to his fraudulent intentions, the creditor must rely on the twelve factors of *Dougherty* to establish the subjective intent of the debtor through circumstantial evidence." *In re Eashai*, 87 F.3d at 1090.

The Ninth Circuit has described the *Dougherty* approach as a "totality of the circumstances" theory and has stated, "Under this theory, a court may infer the existence of the debtor's intent not to pay if the facts and circumstances of a particular case present a picture of deceptive conduct by the debtor." *Id.* at 1087. Applying the elements of actual fraud to the situation of a credit card debt, the Ninth Circuit developed three essential inquiries: (1) did the card holder fraudulently fail to disclose his intent not to repay the credit card debt; (2) did the card issuer justifiably rely on a representation by the debtor; and (3) was the debt sought to be discharged proximately caused by the first two elements. *In re Anastas*, 94 F.3d at 1284 (citing *In re Eashai*, 87 F.3d at 1088).

In *In re Anastas*, the Ninth Circuit clarified that financial condition, *standing alone*, is not a substitute for an actual finding that the debtor intended to deceive the creditor when the charges were incurred. *Id.* at 1286. For this

12

1  reason, the court explained in *Anastas* that a trial court must not singularly focus

2  on the debtor's ability to repay the debts but on whether the debtor incurred the

3  debts with an intent not to repay. *Id.* at 1285. The *Anastas* court further clarified

4  that the "intent not to repay" inquiry must generally be applied to each individual

5  charge made to the credit card. *See id.* In that case, the court viewed each

6  individual credit transaction as the formation of an unilateral contract, in which

7  the card holder promises to repay the debt plus accrued finance charges and the

8  card issuer performs by reimbursing the merchant who accepted the credit card in

9  payment. *Id.*

10      In many credit card cases the inquiry is not whether the card holder
        lacked an intent to repay *all* of the charges made on the card
11      because of a fraudulent financial scheme, but rather whether the
        card holder lacked an intent to repay when making certain
12      *individual* charges because he planned to shortly discharge them in
        bankruptcy. This behavior is commonly referred to as "loading
13      up."

14  *Id.* (emphasis in original).

15      **Fraudulent Use of the Convenience Checks.** Although the Debtor may

16  have used his credit card to obtain the Cash Advance, the Debtor used

17  convenience checks for the four Balance Transfers and the Purchase Transaction.

18  Convenience checks are distinguishable from credit cards in several ways. First,

19  the convenience checks are initiated by the Bank, they are not solicited by the

20  Debtor. Unlike credit cards, which typically carry a very high interest rate,

21  convenience checks are actively promoted with enticements, principally a very

22  low interest rate, for no purpose other than to encourage their use. Because the

23  use of a convenience check presents a somewhat different factual scenario than

24  the use of a credit card, the court must first determine whether the modified

25  *Eashai/Anastas* test for credit card debt is still applicable to convenience checks.

26      In *Turtle Rock Meadows Homeowners Association v. Slyman (In re*

27  *Slyman)*, the Ninth Circuit summarized the structure of a credit card transaction

28  by comparing it to the relationship of the parties in a different type of transaction:

13

[H]omeowner/homeowners association transactions do not bear the distinguishing characteristic of card holder/credit card company transactions. *Transactions between a credit card holder and a credit card company are intermediated by a third-party vendor.* Transactions between a homeowner and a homeowners association, by contrast, are direct and without intermediation.

234 F.3d 1081, 1086 (9th Cir. 2000) (emphasis added).

In a two-party transaction, the creditor "must prove the elements of misrepresentation and reliance directly." *Id.* By contrast, in a three-party transaction, the creditor can "establish these two elements by reference to the 'totality of the circumstances.'" *Id.* (quoting *In re Eashai*, 87 F.3d at 1087–88). Thus, the distinction is significant.

Here, the Debtor's use of convenience checks for the Balance Transfers and Purchase Transaction still constituted three-party transactions. The convenience checks represented, in essence, one-time-use credit vouchers. For the Purchase Transaction, the Debtor presented the convenience check to a third-party intermediary, namely Gillson Jewelers, who then deposited the check and obtained the funds from the Bank. The third-party relationship also applies to the Balance Transfers, where the transferors acted as the third-party intermediaries.

In both scenarios, the Bank transferred its funds to the third parties and then charged those amounts to the Debtor's Credit Card Account. By doing so, the Bank never transacted with the Debtor face-to-face or directly. Therefore, the Balance Transfers and Purchase Transaction must be analyzed under the same standard as the Cash Advance, the one transaction completed by credit card. The Bank has the burden to establish, through the totality of the circumstances, that each separate transaction made with the credit card or the convenience checks was done with fraudulent intent. *In re Anastas*, 94 F.3d at 1285. The court will now examine the transactions in chronological order.

**Fraudulent Intent and the Four Balance Transfers.** The court first turns to the first four transactions at issue, the Balance Transfers. To briefly

14

1   summarize, the Debtor used four of the Bank's convenience checks to transfer

2   the unpaid balances from four other credit card accounts.  The Bank paid those

3   balances and charged them to the Debtor's Account with the promotional

4   incentives offered in the convenience checks.  The Balance Transfers included

5   (1) a $5,100 balance from Wells Fargo Card Services transferred on May 19,

6   2010; (2) a $1,500 balance from U.S. Bank transferred on May 25, 2010; (3) a

7   $3,000 balance from Wells Fargo Card Services transferred on June 15, 2010;

8   and (4) an $800 balance from American Express transferred on July 26, 2010.

9        As stated above, the first inquiry is whether the Debtor entered into these

10   transactions without any intent to repay the subject debt. *See id.* at 1284.  In

11   these cases, "the central inquiry in determining whether there was a fraudulent

12   representation is whether the card holder lacked an intent to repay *at the time he*

13   *made the charge*." *Id.* at 1285 (emphasis added).

14        Turning to the facts of the case, the court acknowledges that some of the

15   circumstances surrounding the Balance Transfers may weigh in favor of the

16   Bank's case.  The four Balance Transfers were made within a short period of

17   time (between May 19 and July 26, 2010) after a period of no activity on the

18   Credit Card Account, and each transfer was for a substantial amount of money

19   (ranging from $800 to $5,100).  At that time, the Debtor was in poor financial

20   condition.  While these facts may be sufficient to support a finding of fraudulent

21   intent, the court must consider all of the relevant circumstances and the Bank has

22   the burden of proving its case by a preponderance of the evidence.

23        Here, there are numerous circumstances surrounding use of the

24   convenience checks that mitigate in the Debtor's favor and which are

25   inconsistent with the argument that the Debtor did not intend to pay his debts.  If

26   the Debtor was, in fact, contemplating bankruptcy to avoid paying his debts, why

27   would he bother to make the four Balance Transfers?  If bankruptcy was already

28   on the Debtor's mind, then he had a greater likelihood of discharging these debts

15

1   by *not* making the Balance Transfers and leaving them with the original credit
2   card issuers. *Cf. First Deposit Nat'l Bank v. Cameron (In re Cameron)*, 219 B.R.
3   531, 534 (W.D. Mo. 1998) ("Debtor acquiesced to [the creditor's] ill-advised
4   offer to transfer credit card balances that would have been discharged if Debtor
5   had rejected the offer and filed for bankruptcy."). If anything, the Debtor was
6   making an attempt—though unrealistic in hindsight—to better manage his debts
7   by transferring his other credit card balances to an account with seemingly more
8   advantageous terms (i.e., no accrued interest for a limited period of time). *Chase*
9   *Manhattan Bank USA, N.A. v. Poor (In re Poor)*, 219 B.R. 332, 337–38 (Bankr.
10  D. Me. 1998) ("A balance transfer . . . is, ostensibly, an attempt at debt
11  management."). The Debtor's "exercise of such an option demonstrates a desire
12  to make debt repayment more affordable (and therefore more likely), rather than
13  an attempt to abuse the card issuer's credit offices." *Id.* at 338.

14       Additionally, the Debtor received almost no benefit from the Balance
15  Transfers, other than the "incentives" promoted by the Bank. He did not receive
16  cash as with the Cash Advance, and he did not receive any goods or services as
17  with the Purchase Transaction. "Indeed, the [Balance Transfers] did not increase
18  [the Debtor's] overall indebtedness. Rather, [the Debtor] refinanced existing
19  debt, merely substituting the identity of his creditors." *Nat'l City Bank v.*
20  *Manning (In re Manning)*, 280 B.R. 171, 193 (Bankr. S.D. Ohio 2002). And as
21  one bankruptcy court has reasoned, "Although that practice may have permitted
22  the Debtor to postpone the day of reckoning, it does not appear designed to
23  enable him to pyramid debts he did not intend to pay." *Huntington Nat'l Bank v.*
24  *Lippert (In re Lippert)*, 206 B.R. 136, 141 (Bankr. N.D. Ohio 1997).

25       Finally, the court is mindful of the fact that the Bank aggressively
26  encouraged the Debtor to use the convenience checks and to transfer other credit
27  card balances to his Account. The promotional material that accompanied the
28  convenience checks touted, "There's no better time to use your checks." The

16

1  Debtor did exactly what the Bank encouraged him to do.  Based on the totality of

2  the circumstances, the court is not persuaded that the Debtor used the Bank's

3  convenience checks to make the four Balance Transfers with the actual intent to

4  not repay the resulting transferred debt.

5        **Fraudulent Intent and the Purchase Transaction.**  Next, the court

6  considers the $2,000 Purchase Transaction that occurred at Gillson Jewelers on

7  August 21, 2010.  The Debtor used another convenience check to complete this

8  transaction.

9        Once again, the Debtor's "negative" financial circumstances discussed

10  above must also be considered with regard to this transaction.  The Purchase

11  Transaction occurred within a cluster of other high-value transactions.  The

12  Debtor's financial situation was abysmal, and his total debt was already in the six

13  figures.  Unlike the Balance Transfers, which did not increase the Debtor's

14  overall indebtedness, the $2,000 purchase did, in fact, do so.  And even though

15  the record is silent as to what the Purchase Transaction was for, the court can

16  infer that it was for non-essential goods or services based on the amount ($2,000)

17  and on the name of the merchant (Gillson Jewelers).  Arguably, these facts weigh

18  in favor of finding fraudulent intent.

19        Nevertheless, the court must also consider the circumstances that mitigate

20  against the Bank.  First, as discussed above, what was the purpose behind using

21  the convenience check and taking advantage of the low, promotional interest rate

22  if the Debtor was already intending to file bankruptcy?  The disparate financial

23  consequences between the regular 13.99% interest rate versus the promotional

24  1.99% interest rate would mean little to someone who was intending to file

25  bankruptcy.  However, for someone who was attempting to better handle his debt

26  levels, the difference is significant.

27        The Bank's promotion of unsolicited convenience checks to the Debtor, at

28  a time when the Debtor was already in a difficult financial situation, is another

17

circumstance that the court must consider. The Debtor never requested the convenience checks from the Bank and rarely even used his Credit Card Account with the Bank. The Bank pushed the Debtor to "make a big purchase" and to do so immediately by offering him convenience checks with an attractive low interest rate and with a narrow window in which to use them. To the Bank, "there's no better time [for the Debtor] to use [his] checks" to make a large purchase than when the Debtor is already burdened with a $10,000 balance on the account. The Bank not only enticed the Debtor with more opportunities to spend by handing him these convenience checks, but it also increased the Debtor's credit limit so that he could actually use those checks. Again, the Debtor did exactly what the Bank encouraged him to do with the convenience checks, and the Debtor, being relatively unsophisticated, accepted the Bank's "generous" offer.

Whenever a credit card issuer provides unsolicited convenience checks to a debtor with aggressive promotional enticements to encourage immediate use of such checks, such as the lure of a teaser interest rate, it will be much more difficult to prove the requisite fraudulent intent based on the "circumstances." When the debtor accepts that seemingly irresistible offer, he only does exactly what the credit card issuer requested. Based on the totality of the circumstances, the court again is not persuaded that the Debtor used the convenience checks for the Purchase Transaction with intent to not repay the resulting debts.

**Justifiable Reliance and the Cash Advance.** The court now evaluates the Cash Advance, the final transaction in the sequence of events. To review, on August 21, 2010, the Debtor went to a local branch of Wells Fargo Bank to obtain a $3,000 cash advance. Based on the documents submitted by the Bank as evidence, it is likely that the Debtor used his credit card, rather than a convenience check, to obtain the advance and that the transaction occurred shortly *after* the Debtor made the $2,000 Purchase Transaction. The inquiry here

18

turns on the issue of the Bank's reliance.  What did the Bank rely on when it unilaterally raised the Debtor's cash advance limit and subsequently authorized the Cash Advance transaction?

The Supreme Court has held that a creditor's reliance on a debtor's representation of intent to repay a debt must only be justifiable, rather than reasonable, to except the debt from discharge under § 523(a)(2)(A). *Field*, 516 U.S. at 74–75.  The standard for "justifiable reliance" under § 523(a)(2)(A) is derived from the standard applied to the common law tort of fraud. *See id.* at 70. In *Field*, the Court looked to the Restatement (Second) of Torts to define that term.  *Id.*  Unlike an objective standard of reasonableness, "'[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases.'"  *Id.* at 71 (quoting Restatement (Second) of Torts § 545A, cmt. b (1976)).  This court must therefore determine whether the Bank's reliance was justifiable based on an "'individual standard of [the Bank's] own capacity and the knowledge which [it] has, or which may fairly be charged against [it] from the facts within [its] observations in the light of [its] individual case.'"  *Id.* at 72 (quoting W. Prosser, Law of Torts § 108, at 717 (4th ed. 1971)).

"Justifiability is not without some limits, however."  *Id.* at 71.  "[A] person cannot rely upon a representation if 'he knows that it is false or its falsity is obvious to him.'"  *Eugene Parks Law Corp. Defined Benefit Pension Plan v. Kirsh (In re Kirsh)*, 973 F.2d 1454, 1458 (9th Cir. 1992) (quoting Restatement (Second) of Torts § 541).  Rather, a person is "'required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'"  *Field*, 516 U.S. at 71 (quoting Restatement (Second) of Torts § 541, cmt. a).  "'In sum, although a person ordinarily has no

19

duty to investigate the truth of a representation, a person cannot purport to rely on preposterous representations or close his eyes to avoid discovery of the truth.'" *In re Eashai*, 87 F.3d at 1090–91 (quoting *Romesh Japra, M.D., F.A.C.C., Inc. v. Apte (In re Apte)*, 180 B.R. 223, 229 (9th Cir. BAP 1995)).

Typically, in a credit card case under § 523(a)(2)(A), "the credit card issuer justifiably relies on a representation of intent to repay as long as the account is not in default and any initial investigations into a credit report do not raise red flags that would make reliance unjustifiable." *In re Anastas*, 94 F.3d at 1286 (citing *In re Eashai*, 87 F.3d at 1091). But "[i]f the creditor had warning that the debtor's account was *in danger of default*, the creditor will not be able to establish justifiable reliance." *In re Eashai*, 87 F.3d at 1091 (emphasis added).

Here, the Debtor did not miss a payment to the Bank until September 2010. This was apparently the first default on the account and arguably, until that date, the Bank had no "warning" that the Debtor might not fulfill his financial commitments to the Bank. However, there were other surrounding facts and circumstances—which should have been apparent to the Bank—that raise serious questions about its "justifiable reliance." Ironically, many of these circumstances involve the same arguments the Bank makes against the Debtor. If the Debtor was in such poor financial condition throughout the summer of 2010 when he used the convenience checks, such that the court could infer fraudulent intent, then what was the Bank relying on in June 2008, when it substantially increased the credit and cash advance limits to accommodate the sudden increase in use of the credit card?

Between June 2009 and April 2010, the Debtor's Credit Card Account with the Bank was essentially dormant. During this time, he used the credit card only twice to make a $25 purchase and a $1,890 purchase, both of which he paid in full the following month. From that point on, the Debtor used his Credit Card Account for only large transactions. By the end of June 2010, the Debtor had

20

transferred, by using three convenience checks, $9,600 worth of unpaid credit card debt to his Credit Card Account, almost reaching his $10,000 credit limit.

The increased activity to the account, seemingly out of nowhere and within a short period of time, should have signaled to the Bank some sort of warning. Also, the type of activity should have raised a similar red flag. Being that they were balance transfers, the Bank at that time was aware that the Debtor had existing, unpaid debts of at least $9,600. The Bank, however, was more focused on promoting the use of convenience checks than on monitoring the Debtor's financial situation. When the outstanding balance on the Credit Card Account increased suddenly and dramatically, instead of becoming cautious about the Debtor's activity, the Bank gave him more credit, unilaterally increasing the credit limit from $10,000 to $15,000 and the cash limit from $2,000 to $3,000. The Debtor did not request these increases, and there is no evidence that the Bank conducted any investigation into the Debtor's then-current financial situation.

To the extent the Bank could justifiably rely on the Debtor's credit activity, its reliance was limited to any debts incurred that fell below the prior $10,000 credit limit. The credit limit on the Debtor's Account had remained at that level since October 2008, and the Debtor had not missed a payment, whenever due, during that period. Before the Balance Transfers, the highest balance on the account was $5,348.73 in 2006. Thus, there would be no reason for the Bank to be concerned under those conditions, because it justifiably believed that the Debtor could manage his debt when his credit limit was $10,000. *Cf. In re Eashai*, 87 F.3d at 1091 ("In some instances, the creditor may *initially* rely on the debtor's credit report (before issuing the credit card) which shows that the debtor has a history of servicing his credit card debt in a timely manner." (emphasis added)).

21

However, the Bank, without any reasonable explanation or justification, increased the credit and cash limits by 50%, up to $15,000 and $3,000, respectively.  The Debtor did not request the increase, and he was not even regularly using his credit card.  But by increasing the credit limit when the Debtor's balance was already close to $10,000, the Bank essentially gave the Debtor a new, pre-approved credit card with a $5,000 limit, totally unsolicited by the Debtor and without any sort of evaluation of the Debtor's current creditworthiness.  Now, the Bank claims it is the innocent victim of a fraud, who justifiably relied on an implied representation that the Debtor would repay the additional debts (i.e., debts incurred after the Bank raised the credit limit).  However, the additional debt, attributable to the Cash Advance, was only made possible due to the Bank's decision to unilaterally increase the cash advance limit without investigation.  But as one bankruptcy court has opined,

> As the more sophisticated party in financial relationships with nearly every consumer, credit card issuers may not stick their heads in the sand for long periods and still claim justifiable reliance when they now have the tools to see a debtor's actual financial situation and they are already closely watching.

*FIA Card Servs. v. Finnerty (In re Finnerty)*, 418 B.R. 1, 11 (Bankr. D.N.H. 2009); *see also In re Kirsh*, 973 F.2d at 1458 ("[I]f a person does have 'special knowledge, experience and competence' he may not be permitted to rely on representations that an ordinary person would properly accept." (quoting W. Page Keeton et. al., Prosser and Keeton on the Law of Torts § 108, at 751 (5th ed. 1984))).

The Bank, as a credit card issuer, cannot justifiably make more credit available to the Debtor and then complain because it did not get paid, when the Bank did nothing to evaluate the Debtor's current ability to repay such debts.  "[C]redit card issuers have an obligation to perform at least minimal investigation into a card [holder's] financial situation before . . . *increasing credit*; otherwise, it will be difficult to find that a credit card issuer relied on

22

1  anything when extending credit." *Compass Bank v. Meyer (In re Meyer)*, 296

2  B.R. 849, 863 (Bankr. N.D. Ala. 2003) (emphasis added); *see also In re Eashai*,

3  87 F.3d at 1091 ("We will not allow a creditor, who has been put on notice of the

4  debtor's intent not to repay, to extend credit and then later claim

5  nondischargeability on the basis of fraud."). Because the Bank failed to perform

6  any kind of cursory investigation prior to raising the Debtor's credit and cash

7  limits, the Bank could not have justifiably relied on the Debtor's implied

8  representation that he would repay the $3,000 Cash Advance, which was made

9  possible only by the Bank's own decision to increase the limits on the Account in

10  the first place.

11       Additionally, a "red flag" should have waved in front of the Bank when

12  the Debtor requested the Cash Advance. With the $3,000 advance on top of the

13  $2,000 Purchase Transaction and the $10,287.56 existing balance, the new

14  outstanding balance on the Credit Card Account exceeded the $15,000 limit. The

15  Bank therefore could have declined to approve the transaction. The Bank cannot

16  have any justifiable reliance when it fails to enforce its own limitations on a

17  credit card holder's account.

18  **CONCLUSION.**

19       Based on the foregoing, the Bank has not sustained its burden to show that

20  the Debtor had the requisite fraudulent intent when he used convenience checks

21  for the Balance Transfers and the Purchase Transaction. With regards to the

22  Cash Advance, the Bank has not shown that it justifiably relied on the Debtor's

23  implied representation when it approved the transaction in the first place.

24  Therefore, judgment will be entered in favor of the Debtor. The Bank's claim

25  against the Debtor in the amount of $16,058.43 will be discharged.

26       Dated: March ___13___, 2013

27                                              W. Richard Lee

28                                              United States Bankruptcy Judge

23

Balour Singh, Case No. 11-10932-B-7/Adv. Proc. No. 11-1136

Balour Singh
6814 Owls Head Ct.
Bakersfield, CA 93313

Frank P. Samples, Esq.
Attorney at Law
1400 Chester Ave., #A
Bakersfield, CA 93301

Dennis Winters, Esq.
Attorney a Law
1820 E. 17th Street
Santa Ana, CA 92705

Jeffrey M. Vetter
Chapter 7 Trustee
P.O. Box 2424
Bakersfield, CA 93303

Office of the U.S. Trustee
U.S. Courthouse
2500 Tulare Street, Ste. 1401
Fresno, CA 93721